OPINION OF THE COURT
Myron E. Tillman, J.
This is an order to show cause brought before the court, seeking an order to compel the Sheriff of Monroe County to keep the petitioner mother and her baby together in the "Monroe County Jail or some other safe place.”
By stipulation of counsel, the following records were submitted to this court for review:
1. Monroe County Department of Social Services, child protective units and foster care units;
2. Monroe County Probation Department;
3. Monroe County Jail.
After three hearings, at the last of which testimony was taken from the petitioner mother, and a review of the voluminous records submitted to the court, the court makes the following findings of facts:
1. The petitioner, Debra Bailey, age 24 years, is currently serving a sentence in the Monroe County Jail.
2. The petitioner was arrested for allegedly intentionally injuring Michael Jackson, the victim, by means of a loaded .22 calibre pistol on November 17, 1977.
3. The petitioner pleaded guilty to assault in the second degree on May 8, 1979, and was sentenced to one year in the Monroe County Jail.
4. The petitioner was sentenced on January 29, 1975 to 6 months in Polk County Jail, Florida, to be followed by 5 years probation without adjudication on charges of forging a signature on a receipt and obtaining goods by false use of credit cards.
5. There is filed in New York an extradition warrant from Florida for the petitioner’s violation of probation.
6. The petitioner pleaded guilty on March 7, 1979, to criminal possession of a forged instrument in Buffalo, New York, Erie County Court, and was sentenced on September 18, 1979, to one year’s incarceration to run concurrently with her Monroe County sentence.
*58 7. The petitioner was pregnant when she entered the Monroe County Jail, and gave birth to an infant girl, Tamara Malika Bailey, on August 19, 1979, in the Strong Memorial Hospital in Rochester, New York.
8. The petitioner made her decision to keep the baby with her in the jail shortly before her sentencing to the Monroe County Jail.
9. The petitioner is and has been breast feeding the baby, Tamara, since her birth.
10. The petitioner is the mother of four other children: Sabrina, age 8, Samuel and Manuel (twins), age 7, and Terrence, age 4.
11. The petitioner did not breast feed her four other children.
12. The Department of Social Services files reveal:
A. There has been a continuing pattern of parent and child separation. The petitioner apparently had physical custody of all three of her older children, alone or in conjunction with her grandmother, until May, 1974, at which time her son, Samuel, then age 2V2 years, accidentally swallowed Draino, causing drastic damage to his esophagus and gastrointestinal system. The child was required to undergo extensive medical treatment at Strong Memorial Hospital in Rochester, New York, as a result of his injuries. The petitioner refused to visit him except on a highly irregular basis (Department of Social Services report dated June, 1974). Upon the petitioner’s consent, the child was placed with the Department of Social Services for foster care during his extensive recuperation. The petitioner’s visits were so irregular while Samuel was in foster care that the Department of Social Services considered filing an abandonment petition in order to terminate permanently the petitioner’s parental rights and to enable placement of the child for adoption. (Department of Social Services report dated October 31, 1974.) While the petitioner was serving her 1975 term of imprisonment in the Polk County Jail, Florida, she learned that the Department of Social Services intended to seek adoption placement for Samuel and she wrote a series of letters to them expressing her serious intent to reunite herself with her son. At this time, she also made reference to her desire for reunion with her other two children.
B. Sometime between March and August of 1976, petitioner delivered her twins to the care of her sister in Philadelphia, *59 Pennsylvania, and she returned to Rochester, New York, with her daughter, Sabrina. For reasons unclear from the record, the twins next gravitated to the home of an alcoholic aunt-in-law and then to an uncle who allegedly did not know of the petitioner’s whereabouts. The twins were finally found in New York City due to the efforts of child protective workers in New Jersey and Monroe County.
C. Reports dated May, 1975, expressed the department’s continuing concern with the inappropriate discipline and lack of adult supervision for the children, although the department indicated that there were no problems with the petitioner’s physical care of the children insofar as shelter and clothing were concerned.
D. In February, 1977, the New Jersey Protective Services filed a complaint of neglect for the twins against the petitioner. This resulted in a consent order and the twins were again placed in the custody of the Department of Social Services in November, 1977.
E. Department of Social Services’ reports dated 1977, concerning the petitioner’s care of Sabrina and Terrence, reflect her continued use of excessive corporal punishment and instances during which the petitioner appeared for counseling sessions while intoxicated. Her living arrangements were described as "erratic” and in June, 1977, the department’s caseworker had "severe reservations” about the adequacy of the physical care and supervision provided for Sabrina and Terrence by the petitioner.
F. On June 5, 1977, the twins were again returned to foster care in Monroe County. It is unclear if the petitioner ever had actual custody of them after they were relocated early in 1977.
G. In February, 1978, the Department of Social Services again considered filing a neglect petition for the twins against the petitioner. During this time, the petitioner wanted all four children to go to Florida to reside with Samuel Johnson, Sabrina’s, Samuel’s and Manuel’s father.
H. A department report dated March 15, 1978, expresses the view that the petitioner was an "unstable” and "undependable” resource for all four children.
I. The actual whereabouts of the children during the period from February, 1978, to either December, 1978, or January, *60 1979, is unclear from the records. The petitioner’s testimony did nothing to clarify the situation.
13. The petitioner did not and has not made any inquiries as to facilities for accommodations for infants in the Monroe County Jail, or in Buffalo or in Florida.
14. The petitioner has little knowledge of her other four children’s likes and dislikes, interests and activities, and acquaintances and friends.
15. The infant, Tamara, is currently residing in the Monroe County Jail with the petitioner mother under a temporary order of this court dated August 24, 1979.
16. The facilities provided by the Monroe County Jail at this time have been accepted as adequate temporary accommodations by all parties. The court personally verified their adequacy on August 29, 1979.
17. Erie County correctional authorities have not yet been able to confirm the adequacy or propriety of their facilities to accommodate the child during any confinement by the mother there.
18. The Law Guardian’s report reflects that Florida has expressed a definite intention not to accept the infant should they extradite the mother for a violation of probation.
Section 611 of the Correction Law deals with births to inmates in correctional institutions. Subdivision 2 thereof, in pertinent part, states, "A child so born may be returned with its mother to the correctional institution in which the mother is confined * * * A child may remain in the correctional institution with its mother for such period as seems desirable for the welfare of such child, but not after it is one year of age”.
The respondent has asked this court to accept an interpretation of this section that would give to him the absolute and unfettered discretion in deciding whether to allow the child to remain in the correctional institution.
The petitioner has asked this court to accept an interpretation of this section that would allow the respondent no discretion and would give to the "breast feeding mother” the absolute right to have her child in the correctional institution with her.
In the absence of qualifying language, the use of the word "may” in a statute is permissive (People v Carroll, 3 NY2d 686).
*61 It is clear from the statute that the Legislature did not intend to give the Sheriff unbridled power in determining whether or not he should allow a child to remain in the correctional institution.
The discretion vested in an administrative body is not unlimited, but must be discretion truly exercised and within the law. Laws are made by the law-making power, and not by administrative officers acting solely on their own ideas as to sound public policy. (Matter of Swalbach v State Liq. Auth., 7 NY2d 518.)
The statute lays down a standard, that of the "welfare of the child”. Unfortunately, what the statute does not do is to provide the Sheriff with any guidelines for determining what is "desirable for the welfare of [the] child”.
Webster’s Third International Unabridged Dictionary defines "welfare” as "the state of faring or doing well: thriving or successful progress in life: a state characterized esp. by good fortune, happiness, well-being or prosperity”.
In many cases in this State, particulary in the past 15 years, the word "welfare” is used interchangeably with the phrase, "best interests”.
This court does not suggest that the welfare of a child is best served by the child being excluded from its mother in every case. Certainly the facts in Apgar v Beauter (75 Misc 2d 439) give rise to an opposite conclusion. That case, however, involved a mother who was "awaiting trial”. The situation at bar differs substantially. Each decision must proceed from its own distinguishing factual origins. In Apgar (supra) the rights of the petitioning mother did not at the time of decision conflict with the rights and welfare of the child. The key to our determination here is the clash between the mother’s right to retain her child and the child’s right to an environment which serves her future welfare. A factual distinction which makes a difference is the conviction and final incarceration of this mother which is subject to uncertain termination. Section 611 of the Correction Law dictates the paramount consideration that must be lent to the child’s rights.
It follows that to allow unrestrained discretion in the Sheriff or an absolute right in the inmate mother would defeat the intent of the Legislature and create an inflexibility in the law which would be unresponsive to the needs of the *62 differing circumstances which appear in every factual situation.
The petitioner mother stated that she decided to breast feed her baby because “she wanted to keep the baby with her.” The moving papers maintain that having the baby with her would assist in the rehabilitation of the mother.
Cases in New York State, culminating in Matter of Bennett v Jeffreys (40 NY2d 543), have shown that a child is no longer considered as a chattel of a parent and where there is a conflict between the interests of the parent and the child, the "best interests” of the child should prevail. The guidelines and principles laid down in Bennett v Jeffreys (supra) have not been confined to the limited area of custody. (See, e.g., Matter of Kim Marie J., 59 AD2d 716.) These guidelines and principles are also appropriate in the case at bar.
When the Sheriff, under his statutory obligation, considers the best interests of the child, he should make his determination based upon the physical and psychological well-being of the new-born child. In exercising his discretion, he might well consider some of the following guides to his decision:
1. Facilities available to care for the mother and child, with particular emphasis on the physical well-being of the child.
2. Parenting background of the mother and her psychological health as might be available from sources, such as the presentencing report of the Probation Department.
3. Any psychiatrist’s report or reports such as reports of the Department of Social Services.
4. The offense for which the mother is serving her sentence and any relevance it might have to her care of the child.
5. The length of the sentence and any other sentence that the mother be required to serve in other jurisdictions, with ^ view toward the affect that institutionalization would have on the child after the first few months, considering the constriction on movement and the sterility of environment. Even among uncommon infants there is a common need for stimulation, mobility and the creation and satisfaction of curiosity within any setting.
The Sheriff, in arriving at his determination, should take the following factors into consideration:
1. What would be the benefits to the child in staying with its mother?
2. What would be the negative effects on the child?
*63 3. What would be the benefits to the child in being placed in foster care by the Department of Social Services?
4. What would be the negative effects of foster care on the child?
Applying these considerations to the case at bar:
1. The child would have the physical and psychological benefits of a breast-fed infant. The child would have the opportunity to "bond” with its natural mother.
2. "The psychological implications for the infant being raised in the confinement of jail were discussed with Dr. Werner Halpern. Dr. Halpern has no express concerns until the child reaches five-six months of age. The first few months of life are basically symbiotic for the child and there is a substantial need for nurturing to be provided by a consistent caretaker. This bonding becomes more difficult to compensate if it is broken after approximately six months of age. The separation can be reconstituted by provision of an appropriate substitute parent relationship most easily early in life, preferably the first month or two. The complication of a child’s being breast fed would not make any unique problem. The weaning would become part of the separation trauma that the child would sustain at any time the nurturing were interfered with or transferred to a substitute parent. The child does not seem to be at risk solely because of her confinement in a jail setting.”
There is no certainty that the child will be able to remain with the mother when she leaves the Monroe County Jail and goes to the Erie County Correctional Institution. Removing the child from its mother at that stage may be even more traumatic for the child. The child would then be placed in foster care where the child would go if removed from the jail now. The addendum to the Department of Social Services’ report before the court shows that the constricted jail environment becomes less acceptable for the child’s welfare once it reaches the age of 5 to 6 months. At that time, the child’s confinement would significantly affect the child’s future development. The jail setting cannot adequately meet the needs of stimulation, mobility and curiosity after that age.
3. The benefits to the child in foster care would be a greater likelihood of continuity and stability for the period of the mother’s incarceration. Placements by the Department of Social Services are into carefully screened environments, and *64 with some effort, a "warm, nurturing foster mother and family,” as suggested in the addendum to the report to the court by the Department of Social Services, could be found.
4. The negative effects of placement would be that the child would be taken off breast feeding and removed from the mother.
"[I]n ascertaining the child’s best interests, the court is guided by principles which reflect a 'considered social judgment in this society respecting the family and parenthood’ [citation omitted]. These principles do not, however, dictate that the child’s custody be routinely awarded to the natural parent” (Bennett v Jeffreys, 40 NY2d 543, 549, supra).
The court appointed a Law Guardian for this infant when the mother first came before this court. Her report gives the court some valuable insight in evaluating the best interests of this child in light of the total past and present of this mother and her children. This report contains some of the same informational tools for guiding the court that might be used by the head of a correctional facility.
The petitioner is a 24-year-old, unmarried mother of five children. The Department of Social Services’ reports reveal a continuing pattern of parent-child separation. Indeed, at one time the petitioner lost contact with two of her children for possibly more than one year. During this period of time she evidenced questionable interest in their whereabouts. They were finally located due to the efforts of the child protective workers of New Jersey and Monroe County. Problems over neglect and supervision of the children reoccur throughout the voluminous files of the Department of Social Services. The petitioner, upon examination by the Law Guardian, revealed very little knowledge of any of her children. She could not answer questions dealing with the most primary interests of a child, such as its favorite color, the name of a friend, or a favorite toy.
The petitioner testified that she knew she was to be sentenced in Buffalo, and so informed her counsel, although he chose not to inform the court at the commencement of this action. Fortunately, a diligent Law Guardian alerted the court. The petitioner also testified that she was aware of the extradition warrant filed by the State of Florida. Petitioner has not attempted to find out what effects the Erie County sentencing or the Florida extradition would have so far as her *65 baby is concerned. Neither has she inquired as to facilities or arrangements for the child.
The petitioner testified that she had not breast fed her four other children, and the motive for breast feeding this infant is, at best, questionable to this court in light of petitioner’s testimony and prior conduct. Subjective intent lies always in the shadows and is not available with absolute certainty for judicial scrutiny. The facts, as revealed by Law Guardian Armer, suggest their own characterization. The mother’s record as a parent is less than ideal.
This court is not without real concern and sympathy for the petitioner. It is possible that having the infant in the jail could be a "rehabilitating experience [which] could well change Petitioner’s life style to one which is more suitable to society.” While this argument by petitioner’s counsel does not fall on deaf ears, the court is aware that the mother’s welfare is not the purpose for which this legislation was passed, nor is it the standard laid down by the Legislature. The statutory standard is the welfare or best interests of the child, Tamara.
If the past does not regulate the future, it is at least a prologue. This court has no other indicator by which to measure the actual interest in parenting that the petitioner might have in Tamara’s later years. The present care and breast feeding is purportedly intended to "bond” this child to that future parenting. Although the petitioner has been a mother for eight years, and the court has no basis to refute the fact that she loves her children, the facts do show that she has never functioned as a nurturing parent to any of them.
In light of all the information before the court — information which may or may not have been available to the Sheriff at the time he made his decision to exclude Tamara from his jail —the court must review whether it was an abuse of discretion for the Sheriff to decline to keep this infant in the jail with its mother.
Sheriff Lombard made his decision on the basis that the facilities at the Monroe County facility were unsuitable for a mother and her breast-fed infant and that there were security hazards in having a baby in the jail. He expressed concern over the effect this arrangement would have on the rest of the prison population.
A decision based on these factors alone, without the benefit of other considerations and standards that highlight the pri *66 mary criterion, the best interests of the child, could be said to be arbitrary and capricious in terms of the statutory standard.
However, this court, with the benefit of information stipulated into the record from the files of the Department of Social Services, the Probation Department, the jail records, and the continuous research of the Law Guardian, finds that it would not be in the best interests of this child to remain in the jail. The Sheriff, in excluding Tamara Malika Bailey, has not abused his discretion in acting for the future benefit and welfare of the infant, despite the protests of the petitioning mother.
Parental rights should not be enshrined at the cost of leaving the child forever at the mercy of a parent’s wavering and fluctuating intent. Somehow, a woman already the mother of four children must be accountable for her actions when she admittedly assaults another in a barroom and commits other crimes against society. All of Debra Bailey’s children, in some manner or other, will be affected by her actions. The misfeasance, malfeasance or nonfeasance of Debra Bailey is magnified in human consequence by the number of her children. The addition of criminal acts, if nothing more, insures longer incarceration and separation from those for whom she is bound legally and morally to have responsibility. A loving parent takes these risks with due notice of the consequences.
We cannot be sure how long the petitioner will be in a jail setting. Certainly long after January 1, 1980, and perhaps (depending on extradition to Florida) a much longer period of time. All sources agree that any claimed benefit to the child, Tamara, from "breast feeding” fades the longer that she is "jailed” with the mother, until the affects of institutionalization are indeed all negative to the future welfare of the child.
To thwart the Monroe County Sheriff in his attempt to remove the child from the jail is to condemn the child to an unsuitable environment for an uncertain time because of crimes committed by her mother. The most elementary concept of justice would make the rights of the wrongdoer parent subservient to the interests of an innocent child.
The petitioner’s motion is therefore denied. The effective date of this order is stayed for seven days to allow time for the Sheriff, the petitioner, and the Department of Social Services to make a placement plan for the care of the child, Tamara Malika Bailey, in a home which will provide her with warm, *67 nurturing care, supervision and a healthly, stimulating environment. This delay and plan is intended to lessen the trauma for the child and the mother. The seven days would also allow for necessary medical advice for the mother.